IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          *

          v.                                                    *          Criminal No. RDB-18-0347

                                                                *

JAMES DORSEY, *et al.*,                 *

          Defendants.                          *

*          *          *          *          *          *          *          *          *          *          *          *          *          *

## MEMORANDUM OPINION

On October 12, 2015 twenty-year-old Markel Benson was robbed as he was selling marijuana on a street corner near 2300 W. North Avenue in Baltimore, Maryland. A short time later, he was murdered. Defendants James Dorsey ("Dorsey"), Ameer Khalil Baker ("Baker"),[1] Deonta Douglas ("Douglas"), and Sim Redd ("Redd") are alleged to have participated in the criminal acts surrounding Benson's death. The Superseding Indictment charges Dorsey, Baker, and Douglas with conspiracy to interfere with commerce through robbery in violation of 18 U.S.C. § 1951(a) (Count One); interference with commerce through robbery in violation of 18 U.S.C. § 1951(a) (Count Two); and using, brandishing, and discharging a firearm during a crime of violence (Count Three). Redd, the alleged getaway driver, is charged with accessory after the fact (Count Four).

Now pending before this Court are: Defendant Dorsey's Motion to Suppress Warrant Evidence (ECF No. 44); Defendant Sim Redd's Motion for Severance (ECF No. 71-1); Defendant Dorsey's Motion to Sever (ECF No. 72-1); and Defendant Dorsey's Motion to

---

[1]          On August 7, 2019, Baker pled guilty to Count One and not guilty as to Counts Two and Three pursuant to a plea agreement.

1

Dismiss (ECF No. 73), which is joined by Defendants Baker and Douglas. On July 18, 2019, this Court conducted a Motions Hearing and heard argument and testimony in support of the pending motions. For the reasons stated herein, Defendant Dorsey's Motion to Suppress Warrant Evidence (ECF No. 44) is DENIED; Defendant Sim Redd's Motion for Severance (ECF No. 71-1) is DENIED; Defendant Dorsey's Motion to Sever (ECF No. 72-1) is DENIED; and Defendant Dorsey's Motion to Dismiss (ECF No. 73) is DENIED. A joint trial will commence on Monday, September 9, 2019.

## BACKGROUND

### I. The Robbery and Murder.

This case arises from the murder of Markel Benson on October 12, 2015 at 6:56 p.m., in the 2100 block of Clifton Avenue in Baltimore, Maryland. At trial, the Government will attempt to prove that several men, including Defendants Dorsey, Baker, and Douglas conspired to rob Benson after seeing him sell marijuana on a street corner outside of the Pak Man Chicken Restaurant situated on 2300 W. North Avenue in Baltimore, Maryland. Three of the men, including Douglas, allegedly approached Benson on foot. A coconspirator pointed a gun at Benson and robbed him of marijuana, cash and two cellular phones. After the robbery, the men fled the scene. At trial, the Government will attempt to elicit testimony from eyewitnesses who claim to have seen Dorsey, Baker, and Douglas participate in the robbery and can recount their roles in the crime.

After he was robbed, Benson allegedly obtained his own gun and searched for the defendants in an ill-fated attempt to retrieve his stolen property. The Government represents

that CCTV street camera footage depicts Benson and his associate walking together minutes before shots were fired. As Benson searched for the robbers, Douglas allegedly directed codefendants Baker and Dorsey to ambush and shoot Benson. At 6:56 p.m., the Government alleges that Baker and Dorsey heeded Douglas's orders, shot Benson, and fled. Benson did not return fire and was killed.

## II. Phone Calls Following the Crime.

Several phone calls allegedly followed the robbery and homicide. Moments after the shooting, Baker allegedly used Benson's stolen cell phone to attempt to contact his "step" grandmother (the mother of his stepfather) and a coconspirator. Later that evening, Redd allegedly accepted two calls from an inmate in a Baltimore correctional facility named Delonte Lang.[2] The Government intends to rely heavily on Redd's calls at trial; in its view, they present a "chilling timeline of Baker and Dorsey's flight after the shooting." (Gov't Resp. 3, ECF No. 51.)

In the first call, recorded at 7:47 p.m., Redd makes a series of statements which a jury could interpret as both implicating Redd as the getaway driver for his codefendants and corroborating the allegations that Dorsey robbed and shot Benson. Recounting the evening's events, Redd can be heard bragging that his "little man" (an apparent reference to Dorsey) "earned his way . . . about half an hour ago" and showed "no hesitation." (Gov't Ex. A at 5, ECF No. 85-1.) Redd also recounts that "he" (Dorsey) called him (Redd) and exclaimed

---

[2] This Court has reviewed the recordings in Chambers. For the purposes of adjudicating these Motions, this Court accepts the Government's representation that the speakers recorded on the call are Redd and Lang. Of course, the Government must establish this at trial.

"come get me, come get me, come get me, come get me[!]" (*Id.* at 12.) Redd recalls to Lang

that he replied, "I'm on my way." (*Id.*)

Another jail call followed at 9:21 p.m. Redd's statements in this call could support the

conclusion that Redd and his codefendants were together shortly after the robbery and

homicide. In the recording, Redd tells Lang that "We just pulled up down outback" and that

he has "both of them with me. Me, Ameer, [(Baker)] and Boosie [(Dorsey)] together." (Gov't

Ex. B at 3, ECF No. 85-2.)

Lang and Redd have denied that these conversations reference anything incriminating.

Federal authorities interviewed both Lang and Redd and questioned them before the grand

jury. In these exchanges, Redd claimed that he was discussing a basketball tournament and

that the "Boosie" and "Meer"[3] he referenced in the call were not Dorsey and Baker. (ECF No.

72-1 at 8.) The Government maintains that both Redd and Lang committed perjury by

providing different and contradictory explanations for the call. (ECF No. 85 at 16.)

III.    **Search and Seizure of Dorsey's Cell Phone.**

During the investigation of this case, the FBI seized Dorsey's cell phone and

subsequently obtained a warrant from U.S. Magistrate Judge Stephanie A. Gallagher to search

its contents. The Baltimore Police Department had originally seized the phone after state

authorities arrested him for drug trafficking and a handgun violation on December 29, 2015.

(Gov't Consolidated Motions Response to Defendants' Pretrial Motions 4, ECF No. 51.) On

April 5, 2016, Dorsey pled guilty to the handgun charge. (Def.'s Supp. Resp. 1, ECF No. 90.)

---

[3]      The Government represents that Redd said "Ameer" while the Defendant claims that he uttered the
name "Meer."

On August 7, 2016, the Baltimore Police Department arrested Dorsey for attempted first degree murder. (*Id.*) Throughout this period, Dorsey's cell phone remained in police custody. Although it is undisputed that Dorsey was not in custody for at least some period between the initial seizure of his phone and his August 2016 arrest (*see* Def.'s Reply 2 n.1, ECF No. 95), Dorsey made no attempt to retrieve his cell phone. Dorsey maintains that any efforts to reclaim the phone would have been futile as it was considered evidence and would be retained by local authorities until the time had expired for him to challenge the sentence imposed for the firearm offense. (*Id.*)

On November 4, 2016, the FBI learned that the phone remained in Baltimore Police Department custody and retrieved it from that agency. Before searching the phone, Special Agent William Filbert of the FBI began drawing up the paperwork necessary to obtain a warrant from a United States Magistrate Judge. His collaboration with the Office of the United States Attorney is memorialized in a series of emails introduced as an Exhibit and presented to Agent Filbert during his testimony at the Motions Hearing. On November 17, 2016, Agent Filbert provided a draft affidavit in support of a warrant application to Assistant United States Attorney Sandra Wilkinson. On November 21, 2016, Wilkinson returned her edits to the affidavit to Filbert and indicated, in effect, that the final warrant application should await submission to the federal magistrate until work on another warrant could be completed. This separate warrant application sought judicial authorization to search a store containing bullet holes believed to be connected to Benson's murder and involved coordination with an FBI evidence team based in Quantico, Virginia. On December 22, 2016, Wilkinson sent Filbert

an email indicating that both warrant applications were ready to be submitted on December 27, 2016—after the Christmas holiday.

In the final version of the warrant affidavit, Agent Filbert set forth the grounds supporting probable cause to search Dorsey's phone. Filbert suspected that Keyon Hawkins ("Hawkins") was among those who had robbed Benson at gunpoint on October 12, 2015 in front of the Pak Man Chicken Restaurant. (Affidavit of Special Agent William Filbert (the "Affidavit") at ¶ 8, ECF No. 44-1.) On October 19, 2016 Keyon Hawkins admitted that he had robbed Benson of his two cell phones and a bag of weed[4] and that he had been with Dorsey and Baker at the time. (*Id.* at ¶¶ 9-10.) After the robbery, Hawkins claimed to have seen Baker and Dorsey run down an alley towards Clifton Avenue just as Benson and his associates were walking on Pulaski toward Clifton. (*Id.* at ¶ 11.) Hawkins then heard three gun shots. (*Id.*) Agent Filbert also averred that cell phones were being used during these events. The affidavit explains that Agent Filbert knew "based on phone records and interviews with witnesses, that Benson's stolen cell phone was used after the murder" and that, in his estimation, it was "highly likely" that Baker had made the calls. (*Id.* at ¶ 12.) The affidavit also stated the following:

> I know that cellular phones were used to communicate with individuals with knowledge of and who participated in the Benson robbery and murder as described herein. I know that there are unidentified cellular telephone numbers that communicated with Hawkins and others both before and after the Benson homicide and that this information is likely relevant to the investigation herein.

(*Id.* at ¶ 17.)

---

[4] The affidavit refers to a "bag of weed." (ECF No. 44-1 at ¶ 9.) Presumably, this is a reference to marijuana.

On December 27, 2016, United States Magistrate Judge Stephanie A. Gallagher of this Court issued two search warrants. (ECF Nos. 44-1, 90-1.) The first warrant authorized the search of Dorsey's phone, a "A Dark-colored Verizon Samsung Telephone, Model SM-B311V, MEID HEX: A000004BEC923A." (ECF No. 44-1.) The second warrant authorized the search of the exterior structure of 2101 N. Pulaski St., Baltimore, MD 21217. (ECF No. 90-2.)

## ANALYSIS

### I. Motion to Suppress Warrant Evidence.

Defendant James Dorsey has moved this Court to suppress "any direct and derivative evidence obtained in connection with the unlawful seizure and search of a cellular telephone recovered from him in December 2015." (Mot. to Suppress Warrant Evidence 1, ECF No. 44.) Dorsey argues that this evidence must be suppressed for three reasons. His primary objection to the search of his phone is that the Government unreasonably acted with "extreme delay" in obtaining a search warrant. (*Id.* at ¶ 10.) Dorsey also contends that the affidavit used to support the Government's search warrant application fails to establish probable cause to support a search of the cell phone. (*Id.* at ¶ 11.) Finally, Dorsey argues that the search warrant itself fails to satisfy the particularity requirement. (*Id.* at ¶ 12.) This Court addresses these arguments seriatim.

#### A. The Government's Delay in Obtaining a Search Warrant Was Not Unreasonable.

Dorsey first argues that the search of his cell phone was unreasonable, regardless of the validity of the search warrant, because the Government waited about 53 days (between November 4, 2016 and December 27, 2016) before obtaining a warrant to search its contents

after acquiring the phone from the Baltimore Police. (*Id.* at ¶ 1.) Dorsey also suggests that the Government's delay is especially unreasonable in light of the fact that the Baltimore Police had been in possession of Dorsey's phone for roughly a year by the time the Government obtained a warrant in December 2016. (*Id.* at ¶¶ 1-2.) The Government responds that the search and seizure of his phone was not unreasonable because Dorsey had a diminished possessory interest in his personal effects by virtue of his incarceration and, alternatively, that Dorsey abandoned his phone because he made no effort to reacquire it after its seizure from the Baltimore Police. (Gov't Supp. Resp. 2-4, ECF No. 90.)

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "A seizure that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.'" *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124, 104 S. Ct. 1652 (1984)). To determine whether an extended seizure violates the Fourth Amendment, this Court must balance "the government's interests in the seizure against the individual's possessory interest in the object seized." *Pratt*, 915 F.3d at 271 (quoting *United States v. Place*, 462 U.S. 696, 703, 103 S. Ct. 2637 (1983)). In assessing the Government's interests, this Court must consider "whether the police diligently pursue[d] their investigation." *Place*, 462 U.S. at 709, 103 S. Ct. 2637; *see also United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012) (explaining that police's failure to offer explanation for delayed pursuit of search warrant reflects indifference and is less likely to be justifiable). To evaluate an individual's possessory interest in the item seized, the Court must consider the suspect's unique circumstances. A suspect who has strongly resisted a search and

seizure, and remains free from police custody, maintains an undiminished interest in the item that the Government has seized. *See Pratt*, 915 F.3d at 271-72. On the other hand, an individual who is incarcerated, and therefore has no access to a seized item, has a significantly diminished possessory interest in that item. *See, e.g.*, *United States v. Sullivan*, 797 F.3d 623, 633-34 (9th Cir. 2015).

An individual who is free from police custody maintains a strong possessory interest in a cell phone by objecting to its seizure and refusing to consent to its search. *Pratt*, 915 F.3d at 271. In *Pratt*, FBI agents were investigating Samuel Pratt for running a prostitution ring that included juveniles. *Id.* at 269. Upon discovering that Pratt had advertised the sexual services of a seventeen-year-old, known as RM, at a hotel, FBI agents arrived at the scene and spoke separately with RM and Pratt. *Id.* at 269-70. At the scene, Pratt admitted that he had nude pictures of RM on his phone but refused to disclose the phone's passcode or share its contents. *Id.* at 270. Over Pratt's objections, the FBI seized the phone but did not obtain a search warrant until 31 days later. *Id.* Throughout this period, Pratt remained free from police custody. *See* Brief of Pratt, TLW-16-207, 2017 WL 6806325, at *11 (Dec. 27, 2017). The Government's only explanation for the delay was that federal agents could not decide whether to pursue the warrant in North Carolina or South Carolina. *Pratt*, 915 F.3d at 270.

Ruling from the bench, the District Court found that the Government's delay was reasonable. *Id.* At trial, it permitted the introduction of evidence obtained from the cell phone. *Id.* Based on this evidence, the jury convicted Pratt on a total of eight counts, including two counts related to child pornography. The United States Court of Appeals for the Fourth Circuit determined that the District Court erred by permitting evidence obtained from the cell

phone at trial, and vacated the child pornography counts. *Id.* at 271. Balancing the Government's interest in seizing the phone against Pratt's possessory interest, the Court found that the 31-day delay was unreasonable and the evidence from the phone should have been suppressed. *Id.* at 272-73. Specifically, the Court reasoned that Pratt's possessory interest in the phone remained undiminished because he refused to consent to its seizure or voluntarily share its contents. *Id.* at 272. The Government's excuse for its delay—confusion surrounding the appropriate jurisdiction for the warrant—was unavailing and did not outweigh Pratt's possessory interests. *Id.* at 272-3.

Pratt was not incarcerated when his cell phone was seized and subsequently searched and was therefore able to claim a strong possessory interest in his cell phone. By contrast, individuals who are incarcerated have significantly diminished possessory interests in their personal effects. *See Sullivan*, 797 F.3d at 633-34 (holding that "[w]here individuals are incarcerated and cannot make use of seized property, their possessory interest in that property is reduced" (citing *Segura v. United States*, 468 U.S. 796, 813, 104 S. Ct. 3380 (1984) (Burger, C.J.) (plurality opinion); *United States v. Clutter*, 674 F.3d 980, 984-85 (8th Cir. 2012)). Numerous district courts have reached this same conclusion. *See United States v. Williams*, CR418-147, 2019 WL 1612833, at *3 n.4 (S.D. Ga. Feb. 27, 2019) (collecting district court opinions finding that prisoners have diminished possessory interests in personal property), *report and recommendation adopted*, CR418-147, 2019 WL 1601375 (S.D. Ga. Apr. 15, 2019). Accordingly, the Government is not required to obtain a search warrant as expeditiously as possible when handling the personal effects of prisoners who have been totally deprived of their access to personal property.

In this case, a balancing of the Government's interest in the seizure against Dorsey's possessory interest in his phone weighs in favor of the Government. Dorsey had a severely diminished property interest in his cell phone at the time that federal agents retrieved it from the Baltimore Police. Dorsey has been incarcerated, save for a brief and unspecified period of release, since August 2016. The Government acquired his cell phone in November 2016 and obtained a search warrant after the holidays, on December 27, 2016. Throughout this time, Dorsey remained in custody and had no control over his phone, which had been in the possession of the Baltimore Police for about a year following his arrest for a handgun violation in December 2015. Although Dorsey was free from custody at some point between the initial seizure of his phone and his August 2016 arrest, he made no effort to regain possession of the phone because, he argues, any such efforts would have been futile in light of on-going criminal proceedings. Dorsey had almost no control over his phone and, by his own admission, had no ability to regain possession of it. He was not so much as inconvenienced by its seizure. Accordingly, his possessory interest in the phone was severely diminished.

The Government's interest in the seizure outweighs Dorsey's slight possessory interest in the phone. During the Motions Hearing, Special Agent Filbert credibly testified that the FBI and the Office of the United States Attorney had been working diligently since early November 2016 to obtain a search warrant for its contents. Agent Filbert also admitted that he could have drafted an affidavit to support a search warrant application immediately after the FBI acquired the phone and that federal magistrate judges are available 24-hours per day throughout the week to evaluate search warrant applications. These facts, however, do not render the Government's delay "unreasonable." The evidence suggests that the Government,

mindful that Dorsey was incarcerated and had no access to his phone, desired to obtain both the warrant for Dorsey's phone, as well as a warrant to search a building for bullet fragments, at the same time. In so doing, the Government consolidated its investigatory efforts and respected the magistrate's busy schedule. The timeline of events presented in Agent Filbert's testimony and corroborated by emails does not suggest that the Government was "indifferent" to the search or to Dorsey's rights, *see Burgard*, 675 F.3d at 1033, but rather that it was diligently pursuing an important investigation. *See Place*, 462 U.S. at 709, 103 S. Ct. 2637. The balancing of the parties' respective interests does not indicate that the Government's delay was unreasonable. Accordingly, suppression is not warranted on this basis.

Additionally, Dorsey's inaction resulted in the abandonment of his phone. The Fourth Amendment only protects property for which an individual maintains a "subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038 (2001). There is no reasonable expectation of privacy in abandoned property; consequentially, one cannot seek suppression of evidence obtained from abandoned items. *United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995). To determine whether an item has been abandoned, this Court must consider whether the circumstances suggest that the complaining party has relinquished his reasonable expectation of privacy in the item. *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005). In some cases, an individual's failure to maintain his property relinquishes this expectation and results in abandonment. *See United States v. Haynie*, 637 F.2d 227, 237 (4th Cir. 1980) (finding that defendant abandoned apartment because his lease had expired for nearly two months and contained no clothing or food and was without telephone service); *United States v. Wilson*, 472 F.2d 901, 903 (9th Cir. 1973)

(finding that defendant had abandoned his apartment, in spite of the fact that he maintained personal property there, because he had departed the residence and was delinquent in rental payments).

In this case, Dorsey abandoned his phone by failing to contest its seizure or otherwise seek its return. Dorsey admits that he was not detained between December 31, 2015 and August 9, 2016. (ECF No. 95 at 2 n.1.) During this period, he could have, but did not, petition for the return of his phone. Dorsey's complete disregard for his phone and disinterest in pursuing its return, like the Defendants' disregard for their apartments in the *Haynie* and *Wilson* cases, results in abandonment. Dorsey's explanations for his inaction are unpersuasive.[5] He complains that he had "virtually no time" to petition for the return of his phone. He admits, however, that he was out of custody for several months. This afforded him enough time to request its return. Dorsey also maintains that any efforts to regain his phone would have been futile, but elsewhere argues (without elaboration) that state authorities had retained it "unlawfully." (ECF No. 95 at 4 n.3.) If this were so, then he could have raised meritorious arguments in pursuit of the phone's return. Dorsey did not raise these arguments, however. Instead, he allowed his phone to remain in Baltimore Police custody for roughly a year without protest and despite having the opportunity seek its return. Under these circumstances, Dorsey's inactivity resulted in abandonment. Accordingly, Dorsey is not entitled to the suppression of evidence obtained on the phone.

---

[5] Dorsey additionally argues that the Government has not established that he failed to request the return of his phone. The Government has met its burden by representing that court records do not indicate that Dorsey filed a petition for the return of his cell phone. (ECF No. 90 at 4.) If Dorsey had in fact filed such a petition, he could remedy all confusion by producing it. He has not done so.

## B. Agent Filbert's Search Warrant Affidavit Supported the Magistrate's Finding of Probable Cause.

Dorsey argues that the search warrant issued by Magistrate Judge Gallagher for the cell phone "was issued upon an affidavit that provided insufficient facts to establish probable cause. . . ." (ECF No. 44, at ¶ 11.) Dorsey finds fault with numerous aspects of the affidavit. He argues that it (1) fails to allege that he participated in the planning of, or the actual robbery of, Benson; (2) that it is based in part on hearsay statements relayed to Hawkins; (3) that its factual allegations are "vague"; and (4) that it makes allegations based on "general intelligence" and Dorsey's affiliation with the Purple City Bird Gang ("PCBG"). (*Id.* at ¶¶ 4-7.) Dorsey's main contention, however, appears to be that the affidavit fails to establish a factual nexus between the alleged criminal activity at issue and Dorsey's phone. (*Id.* at ¶ 8.) Dorsey argues that the affidavit fails to establish this factual nexus because it does not allege that Dorsey used a phone to communicate with Hawkins or others about the robbery or that a phone number connected to the phone at issue communicated with Hawkins or others. (*Id.*)

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court of the United States "has required that the existence of probable cause be decided by a neutral and detached magistrate whenever possible." *Gerstein v. Pugh*, 420 U.S. 103, 112, 95 S. Ct. 854 (1975) (citing *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S. Ct. 367 (1948)). "An affidavit supporting a warrant that authorizes a search or seizure 'must provide the magistrate with a substantial basis for determining the existence of probable cause' in light of the totality of the circumstances." *United States v. Marion*, 547 F. App'x 283,

286 (4th Cir. 2013) (per curiam) (quoting *Illinois v. Gates*, 462 U.S. 213, 239, 103 S. Ct. 2317 (1983)). To establish probable cause, "'the facts presented to the magistrate need only 'warrant a [person] of reasonable caution' to believe that evidence of a crime will be found.'" *Marion*, 547 F. App'x at 286 (quoting *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (per curiam)). The magistrate is required "simply to make a practical, commonsense decision whether, given all the circumstances in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990) (quoting *Gates*, 462 U.S. at 238). The United States Court of Appeals for the Fourth Circuit has held that "'a magistrate's assessment of the facts when making a determination of probable cause'" should be afforded "'great deference.'" *Blackwood*, 913 F.2d at 142 (quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S. Ct. 584 (1969)).

The Fourth Amendment further "requires a sufficient nexus between the criminal conduct, items to be seized, and the place to be searched." *United States v. Abraham*, 213 F. App'x 240, 247 (4th Cir. 2007) (per curiam) (citing *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988)). "[T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence." *Anderson*, 851 F.2d at 729.

In this case, the affidavit of Special Agent William Filbert both provided ample basis for the probable cause determination and, additionally, satisfied the nexus requirement. The warrant application was supported by the affidavit of Special Agent William Filbert, who recounted the statements of Keyon Hawkins. (ECF No. 44-1, at ¶ 9.) Hawkins, along with

the Defendants named in this case, had allegedly robbed the victim, Markel Benson. (*Id.*) Hawkins explained that Dorsey's role in the robbery, that he had remembered seeing him with a 9mm semiautomatic gun that day, and that Baker had told him (Hawkins) that Dorsey had "that body" (*i.e.*, that Dorsey had shot Benson). (*Id.* at ¶ 13.) The Affiant also explained that he knew that unidentified numbers had contacted Hawkins' phone and others before and after the Benson homicide. (*Id.* at ¶ 17.) Finally, the Affidavit explained that the affiant "know[s] that cellular phones were used to communicate with individuals with knowledge of and who participated in the Benson robbery and murder . . . ." (*Id.*) While the Affidavit does not specifically aver that Agent Filbert knew that Dorsey in particular had talked on his phone that day, the magistrate's probable cause determination reflects a common sense view of the materials before her. The magistrate was aware that (1) a witness had implicated Dorsey in the shooting; (2) unknown numbers had contacted Hawkins' phone before and after the homicide; and (3) the codefendants had communicated via phone before and after the homicide. The totality of these averments provide probable cause to search the phone. They also sufficiently establish that evidence of the crime could be found on Dorsey's cell phone.

### C. The Search Warrant Satisfies the Particularity Requirement.

Finally, Dorsey argues that the "warrant does not particularly describe the content of the cellular telephone to be searched." (ECF No. 44, at ¶ 12.) Dorsey appears to argue that the particularity requirement takes on heightened significance when the Government seeks to search a cell phone. *See Riley v. California*, 573 U.S. 373, 393, 134 S. Ct. 2473 (2014) (noting that cell phones differ from other types of personal effects due to their "immense storage capacity"). The Government does not directly respond to this argument in its briefing, and

Dorsey chose not to argue the issue during the Motions Hearing. Nevertheless, for the sake of completeness, this Court will briefly address the argument.

A search warrant "must particularly describe the place to be searched, and the persons or things to be seized." *United States v. Kimble*, 855 F.3d 604, 610 (4th Cir. 2017) (quoting *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006)). This is generally referred to as the "particularity requirement," the purpose of which is to protect against "a general exploratory rummaging in a person's belongings." *Kimble*, 855 F.3d at 610 (quoting *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001)). Although electronic devices like cell phones and laptops contain vast amounts of personal data, warrants authorizing searches of these devices are not subject to a heightened particularity requirement. *See, e.g.*, *United States v. Grinder*, CCB-17-0226, 2018 WL 2943235, at *5 (D. Md. June 12, 2018) (rejecting argument that warrant for cell phone "requires a more robust particularity requirement" and that Government had heeded Supreme Court authority, including *Riley v. California*, 134 S. Ct. 2473, 2482 (2014), by obtaining a warrant for cell phone data).

The affidavit in this case satisfies the particularity requirement. It specifies precisely the item to be seized: "A Dark-colored Verizon Samsung Telephone, Model SM-B311V, MEID HEX: A000004BEC923A." Additionally, Attachment A to the Search Warrant authorized the search of a discrete set of items in the cell phone, including "contact logs that refer to the use of any and all numbers on the Target Cell Phone" and "call logs reflecting date and time of received calls." (ECF No. 44-1 at 11.) This Court is mindful that cellphones contain a wealth of personal data. In this case, however, the Government pursued the proper

judicial channels and the search warrant it obtained specified precisely the items to be searched. Accordingly, Dorsey is not entitled to suppression on this basis.

### D. The Good Faith Exception Applies.

Even if the warrant was defective in some technical sense, evidence seized in connection with the warrant does not require suppression because the government agents who executed it acted in good faith. The good faith exception to the exclusionary rule permits the introduction of evidence obtained in reasonable reliance on a defective search warrant. *United States v. Seerden*, 916 F.3d 360, 366 (4th Cir. 2019) (citing *United States v. Leon*, 468 U.S. 897, 909, 104 S. Ct. 3405 (1984)). The good faith exception ordinarily applies when a warrant has been acquired, as "[o]fficers executing warrants are not often expected to question the conclusions of an issuing authority." *Seerden*, 916 F.3d at 367 (citing *Messerschmidt v. Millender*, 565 U.S. 535, 547, 132 S. Ct. 1235 (2012). The Supreme Court has identified five rare circumstances in which the exception does not apply:

> (1) where a magistrate issues a warrant based on a deliberately or recklessly false affidavit. *See Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674 (1978);
>
> (2) where a magistrate lacks neutrality and detachment. *See Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326-28, 99 S. Ct. 2319 (1979);
>
> (3) where a warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923, 104 S. Ct. 3405 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11, 95 S. Ct. 2254 (1975) (Powell, J., concurring in part);
>
> (4) where a warrant is so facially deficient that a reasonable officer could not believe it was valid, *see id.* at 923, 104 S. Ct. 3405; and
>
> (5) where police recklessly maintain or knowingly enter false information into a warrant database to enable a future arrest. *Herring v. United States*, 555 U.S. 135, 145, 129 S. Ct. 695 (2009).

*Seerden*, 916 F.3d at 366-67.

In this case, Dorsey makes no accusation that the affidavit is "deliberately reckless or false"; that the magistrate lacked neutrality, or that the police entered false information into a database. Accordingly, circumstances (1), (2), and (5) have no applicability here. As this Court has already concluded that the affidavit supports the Magistrate's probable cause finding, circumstances (3) and (4) are also absent.

Nevertheless, Dorsey argues that the good faith exception does not apply in this case because the agents' wrongful conduct occurred not upon the execution of the search warrant, but as a result of the agents' delay in obtaining the warrant. (ECF No. 95 at 5.) It is the agents' delay, and not their bad faith acquisition and execution of a search warrant, which the application of the exclusionary rule would deter in this case. As the Fourth Circuit has noted, the "deterrent effect of the exclusionary rule must be judged at the point of the constitutional violation, and the culpability of the actors involved then." *United States v. Davis*, 690 F.3d 226, 253 (4th Cir. 2012). Although it does not appear that the Fourth Circuit has examined the applicability of the good faith exception where the alleged constitutional violation is the delayed acquisition of a search warrant, the United States Court of Appeals for the Seventh Circuit has held that it is "not automatically available as soon as a warrant materializes." *United States v. Burgard*, 675 F.3d 1029, 1036 (7th Cir. 2012). The Seventh Circuit suggested that it may be available in "a situation in which the unreasonableness of a delay is a very close call." *Id.*

The officers' delay in obtaining a search warrant in this case, even if ultimately found to have run afoul of the Constitution, does not require suppression because the delay was attended by good faith. As previously noted, numerous courts have held that a defendant's

possessory interest in his personal property is severely diminished by his incarceration. The agents' actions in this case essentially amounted to the transfer of Dorsey's cell phone from the possession of one sovereign to another. Dorsey experienced virtually no change in his possessory interest in the phone as a result of this transfer; he remained in prison and could not access it, no matter which government entity had taken hold of the phone. Under these circumstances, where the possessory interest is so slim, and infringement of that interest so slight, this Court may safely conclude the government agents acted in good faith by delaying their pursuit of a search warrant. Accordingly, even if the acquisition of the search warrant, and the search warrant itself, produced a constitutional violation, such violation does not warrant exclusion as a result of the application of the good faith exception to the exclusionary rule.

## II.    Dorsey's Motion to Dismiss Count Three of the Superseding Indictment.

Defendant Dorsey moves to dismiss Count Three of the Superseding Indictment, which charges him with discharging a firearm during the commission of a crime of violence (in this case, Hobbs Act robbery), in violation of 18 U.S.C. § 924(c). (ECF No. 75.) Dorsey argues that Hobbs Act robbery is not a "crime of violence" and therefore the Government cannot obtain a conviction for the 924(c) charge. Defendants Baker and Douglas have joined his Motion.

In Counts One and Two of the Superseding Indictment, Defendants Dorsey, Baker, and Douglas are charged with conspiring to commit, and committing, Hobbs Act robbery. The Hobbs Act prohibits any person from "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by robbery or extortion or

attempts or conspires so to do, or commit[ting] or threaten[ing] physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section . . ." 18 U.S.C. § 1951(a). Hobbs Act robbery is defined in 18 U.S.C. § 1951(b)(1) as follows:

> [T]he unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, *by means of actual or threatened force, or violence, or fear of injury,* immediate or future, *to his person or property,* or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

In Count Three, Defendants Dorsey, Baker, and Douglas are charged with "Use/Brandish/Discharge of a firearm during a Crime of Violence" in violation of 18 U.S.C. § 924(c). This statute imposes an additional term of incarceration upon "[a]ny person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." § 924(c)(1)(A). In this case, Hobbs Act robbery serves as the underlying "crime of violence" during which the Defendants allegedly used/brandished/discharged a firearm. A "crime of violence" is defined as a federal offense that is a felony and

> (A)    has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)    that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 924(c)(3)(A) & (B).

Subsection A is commonly known as the "force clause" while Subsection B is called the "residual clause." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019). In this most recently concluded Term of Court, the Supreme Court in *United States v. Davis*, 139 S. Ct. 2319 (2019)

declared that the residual clause, § 924(c)(3)(B), is unconstitutionally vague.[6]  Accordingly, the Government must establish that Hobbs Act robbery is a "crime of violence" under the force clause, § 924(c)(3)(A).

To determine whether Hobbs Act robbery constitutes a "crime of violence" under § 924(c), this Court must first decide whether to employ the so-called "categorical approach" or the "modified categorical approach." *United States v. Clarke*, 171 F. Supp. 3d 449, 453 (D. Md. 2016).  In general, courts apply the categorical approach to determine whether a predicate offense amounts to a "crime of violence" under the force clause. *Descamps v. United States*, 570 U.S. 254, 257, 133 S. Ct. 2276, 2281 (2013).  This approach applies when the underlying offense contains a single set of indivisible elements. *Descamps*, 570 U.S. at 257m 133 S. Ct. 2276.  Under this approach, the court looks "only to the fact of conviction and the statutory definition of the offense" to determine whether the predicate offense constitutes a crime of violence. *United States v. Cabrera-Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013) (quoting *Taylor v. United States*, 495 U.S. 575, 602, 110 S. Ct. 2143 (1990).  Referencing only the elements of the cause of action, the court must determine whether all conduct proscribed by the statute, including "the most innocent conduct," qualifies as a crime of violence as the term is defined by § 924(c).  *United States v. Middleton*, 883 F.3d 485, 488 (4th Cir. 2018) (quoting *United States v. Diaz-Ibarra*, 522 F.3d 343, 348 (4th Cir. 2008).

Under the modified categorical approach, this Court may look outside the statutory definition to determine whether a predicate offense constitutes a "crime of violence" for

---

[6]     The United States Court of Appeals for the Fourth Circuit had previously reached the same conclusion in *United States v. Simms*, 914 F.3d 229, 236 (4th Cir. 2019) (en banc).

purposes of § 924(c). "The modified categorical approach allows the court to examine approved documents, including an indictment, to determine which statutory alternative is implicated by the predicate offense." *Clarke*, 171 F. Supp. 3d at 452 (quoting *United States v. Hancock*, 168 F. Supp. 3d 817, 820 (D. Md. 2016)). This approach should be applied only to "divisible" statutes which "list[s] elements in the alternative, and thereby define[s] multiple crimes." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016).

This Court must first employ the modified categorical approach to determine whether a conviction under the Hobbs Act constitutes a "crime of violence" for purposes of 18 U.S.C. § 924(c). *See, e.g.*, *Clarke*, 171 F. Supp. 3d at 453; *Hancock*, 168 F. Supp. 3d at 824. As this Court has previously explained, the Hobbs Act contains "both divisible and indivisible provisions." *Hancock*, 168 F. Supp. 3d at 820. The statute prohibits both robbery and extortion, two independent criminal acts. *Id.* Accordingly, this Court must use the modified categorical approach, which permits consultation of the indictment, to determine whether the Defendants have been charged with robbery or extortion. In this case, the Defendants have clearly pled not guilty to Hobbs Act robbery (as opposed to extortion), as the Indictments charge them with robbing Markel Benson at gunpoint of marijuana and his cellular telephones.

Having determined that Dorsey and his codefendants have been charged with Hobbs Act robbery, as opposed to Hobbs Act extortion, this Court must employ the categorical approach to determine whether this offense constitutes a "crime of violence" under § 924(c). *Clarke*, 171 F. Supp. 3d at 453. Applying this approach, the United States Court of Appeals for the Fourth Circuit as held that it does. *See, e.g.*, *United States v. Mathis*, --- F.3d ---, 2019 WL 3437626, at *15-16 (4th Cir. July 31, 2019); *see also United States v. Smith*, RDB-18-0271, 2019

WL 1099947, at *4 (D. Md. Mar. 8, 2019); *United States v. Cureton*, RDB-16-0087, 2017 WL 2569723, at *7 (D. Md. June 14, 2017); *Clarke*, 171 F. Supp. 3d at 457; *Hancock*, 168 F. Supp. 3d at 822-24.

Despite this overwhelming authority, Dorsey and his codefendants maintain that Hobbs Act robbery can be committed by "causing fear of future injury to intangible property" and therefore does not constitute a "crime of violence" under the force clause. (ECF No. 73, at 3.) Dorsey reaches this conclusion in part by citing inapposite case law citing Hobbs Act extortion cases. *See, e.g., United States v. Iozzi*, 420 F.2d 512, 514 (4th Cir. 1970) (sustaining Hobbs Act extortion convictions). The argument is not a new one and has been rejected by this Court on at least two occasions. As this Court has explained, both Hobbs Act robbery and § 924(c) allude to the use of force or threat of force against "property," without further elaboration. *See Clarke*, 171 F. Supp. 3d at 454. To the extent that Hobbs Act robbery can be committed by threatening harm to intangible property, it is also possible to commit a "crime of violence" in the same manner. *Id.* (citing *Hancock*, 168 F. Supp. 3d at 822-24).

Dorsey maintains that these cases do not foreclose his arguments, as he has relied upon model jury instructions for additional support. Model jury instructions can illuminate how statutory language is applied in real cases. *See Omargharib v. Holder*, 775 F.3d 192 (4th Cir. 2014) (examining Virginia model jury instructions to determine whether larceny is set forth in divisible elements under Virginia law). Dorsey notes that the Sand Model Federal Jury Instructions defines robbery as "the unlawful taking or obtaining of personal property of another against his will by threatening or actually using force, violence, or fear of injury, immediately or in the future, to person or property." Sand, *et al., Model Federal Jury Instructions*

24

*Criminal* ¶ 50.01. A selective reading of this definition causes Dorsey to conclude that Hobbs Act robbery may be perpetuated by causing fear of future injury to intangible property. Nonetheless, it is unclear how even this innocuous definition assists Dorsey's cause. As Dorsey's counsel acknowledged at oral argument, the Sand instructions defines "fear of injury" as requiring the victim to feel threatened. Under the Sand instructions, even the most "innocent" version of Hobbs Act robbery involves depriving a victim of his or her property through the threat of violence, and therefore the offense categorically falls under the Force clause. As the Hobbs Act robbery charge of Count Two may serve as the offense underlying the Defendants' § 924(c) charge in Count Three, Count Three of the Superseding Indictment does not require dismissal.

## III. Dorsey and Redd's Motions to Sever.

Invoking Rules 8(b) and 14 of the Federal Rules of Criminal Procedure, both Defendants Dorsey and Redd have moved to sever Dorsey's trial on Counts One through Three of the Superseding Indictment from Redd's Trial on Count Four. (ECF Nos. 71-1, 72-1.) In general, Redd argues that he has been misjoined with his codefendant as the crime for which he is charged, accessory after the fact, has no factual nexus with the robbery and homicide at the heart of this case. (ECF No. 71-1.) Redd also argues that trying him with the other three defendants is unduly prejudicial. (*Id.*) Dorsey joins these arguments and additionally claims that Redd's joinder is prejudicial because he was added to this case at the eleventh hour to "backdoor" his statements which, although implicating Dorsey in the robbery, would be inadmissible hearsay in a trial against Dorsey alone. (ECF No. 72-1.)

### A. Dorsey and Redd are Properly Joined Under Rule 8(b).

Redd argues that he has been misjoined under Rule 8(b) because he "was in no way involved in the actions allegedly carried out by his codefendants." (ECF No. 71-1 at 2.) He argues that the Government's charging decisions reflect this reality, as he is not charged in the conspiracy, robbery, or § 924(c) charges with his codefendants, but only as an accessory after the fact. (*Id.*) Dorsey adopts and echoes these arguments. Rule 8(b) of the Federal Rules of Criminal Procedure governs the joinder of charges when multiple defendants are involved.

> The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed. R. Crim. P. 8(b). The "level of relatedness required to satisfy Rule 8(b)'s requirements" has been described as follows:

> "Separate acts constituting separate offenses are sufficiently related to be within the same series if they arise out of a common plan or scheme." *United States v. Porter,* 821 F.2d 968, 972 (4th Cir.), *cert. denied,* 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1987). "There must be a series of acts unified by some substantial identity of facts or participants." *Id.* "We have defined 'transaction' flexibly, as 'implying a connection or logical relationship rather than immediateness.'" *United States v. LaRouche,* 896 F.2d 815, 830 n. 5 (4th Cir.1990), *quoting United States v. Carmichael,* 685 F.2d 903, 910 (4th Cir. 1982).

*United States v. Davis*, DKC-11-0171, 2011 WL 6369253, at *3 (D. Md. Dec. 19, 2011) (quoting *United States v. Haney*, 914 F.2d 602, 606 (4th Cir. 1990). So long as codefendants are alleged to have taken part in the same series of acts or transactions, defined flexibly, defendants may be charged in the same indictment even if they are not charged with the same offenses. *See United States v. Mills*, 597 F.2d 693, 695-96 (9th Cir. 1979) (finding that trial court did not abuse its discretion by denying severance to defendant charged with being an accessory after the fact, even though he was not charged with armed bank robbery as were his codefendants); *United*

*States v. Dye*, 508 F.2d 1226, 1236 (6th Cir. 1974) (permitting joinder of defendant charged as an accessory after the fact but not as a member of the alleged conspiracy).

Redd and Dorsey are properly joined as codefendants because their actions are so connected to the acts of their codefendants as to form the same common plan or scheme. Counts Two and Three of the Indictment allege that Redd played an essential role as the getaway driver. The Government will seek to prove that he rendered assistance to his codefendants immediately after their actions resulted in Benson's homicide. The Government will introduce recordings of Redd, taken just about an hour after Benson's death, to demonstrate that he was a willing and eager participant in the sordid affair charged in the indictment. Although Redd's actions are not alleged to be as serious as those of his codefendants, the gravity of his actions do not control the analysis. Mindful of the Fourth Circuit's "flexible" understanding of the term "transaction," Redd's alleged decision to drive the getaway car for the codefendants in this case permits his joinder in this action.

Dorsey argues that joinder is nevertheless improper because Redd is not joined in Counts One, Two, or Three with his codefendants, but rather is charged alone in Count Four as an accessory after the fact. As previously noted, overlapping charges are not required for joinder so long as the Defendants are alleged to have taken part in the same series of transactions. *See Mills*, 597 F.2d at 695-96; *Dye*, 508 F.2d at 1236. Nevertheless, some persuasive authority holds that severance may be necessary where there is no overlap of charges among defendants. *See United States v. Eagleston*, 417 F.2d 11, 14 (10th Cir. 1969); *United States v. Garganese*, 156 F.R.D. 263, 266 (D. Utah 1994).

*Eagleston* and *Garganese* have limited applicability to this matter because they presented very different factual circumstances. In *Eagleston*, the Tenth Circuit found misjoinder of a codefendant who had been charged alone in a three-count indictment with stealing a car because the theft had occurred two weeks before the defendants' joint burglary and was not used to facilitate it. 417 F.2d at 13-14. In *Garganese*, the District of Utah ordered severance after observing that two Defendants were not charged in counts 1-96 and that the criminal conduct alleged in those counts were "distinct and separate" from the criminal activity alleged in the remaining counts. 156 F.R.D. at 268.

In this case, Redd is alleged to have acted as the getaway driver for his codefendants. Accordingly, his actions are intertwined with the actions of his coconspirators and he is certainly a participant in the circumstances giving rise to this case. Unlike the carjacking in *Eagleston*, which took place weeks before the criminal events in question and was of no assistance to the charged burglary, Redd's alleged criminal activity took place on the day of the robbery and was used to facilitate his codefendant's criminal activity. Moreover, Redd's alleged decision to transport his codefendants from the scene of the crime can hardly be considered "distinct and separate" from the remaining three counts of the indictment. Accordingly, Redd and Dorsey are not misjoined and severance is not warranted on this basis.

### B. Joinder is Not Prejudicial under Rule 14.

Redd and Dorsey argue that they would be prejudiced by joinder for very different reasons. Redd argues that joinder is prejudicial because the jury will likely conflate his relatively mild criminal activity with the "brutal, violent and fatal actions" of his codefendants. (ECF No. 71-1.) Dorsey, on the other hand, argues that joinder is prejudicial because by trying

Dorsey and Redd together, the Government will be able to introduce Redd's hearsay statements into evidence which would otherwise not be admissible in a trial against Dorsey, Baker, and Douglas alone.

Rule 14 of the Federal Rules of Criminal Procedure affords the district court discretion to order severance even if joinder under Rule 8(b) is proper. *United States v. Lane*, 474 U.S. 438, 449 (1986). Rule 14(a) states:

> If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

Fed. R. Crim. P. 14(a). Only in the "rare" case will properly joined charges require severance. *United States v. Cardwell*, 433 F.3d 378, 387 (4th Cir. 2005). In seeking severance under Rule 14, the defendant must make a "genuine" and "strong showing of prejudice." *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence." *Cardwell*, 433 F.3d at 387-88 (citing *Zafiro v. United States*, 506 U.S. 534, 539 (1993)); *accord United States v. Qazah*, 810 F.3d 879, 891 (4th Cir. 2015). A risk of such prejudice may arise "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant." *Cardwell*, 433 F.3d at 388 (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933 (1993)). A limiting instruction, however, may vitiate any potential jury confusion and alleviate the need for separate trials. *Cardwell*, 433 F.3d at 388 (holding that district court's jury instruction cured any potential prejudice arising from joinder of charges under Rule 8(a)).

### 1. Redd's Prejudice Concerns May be Cured by a Jury Instruction.

Redd's concern that the jury will conflate his criminal activity (driving his codefendants from the scene) from the violent actions of Dorsey, Baker, and Douglas can be remedied by a limiting instruction. In language to be agreed upon by the parties, the jury will be instructed that it must consider each count and each defendant separately. *See Zafiro*, 506 U.S. 534, 540 (1993) (holding that the jury was properly instructed to "give separate consideration to each individual defendant and to each separate charge against him") (citing *Schaffer v. United States*, 362 U.S. 511, 516 (1960)); *Cardwell*, 433 F.3d at 388 (holding that instruction that "[e]ach charge, and the evidence pertaining to it, should be considered separately" sufficed to alleviate potential prejudice stemming from joinder of charges). As Redd's concerns can be alleviated with a routine jury instruction, severance is not required on this basis.

### 2. Dorsey Will Not be Prejudiced by the Introduction of Select Portions of the Redd Prison Call.

Dorsey and the Government focus on whether dozens of Redd's statements may be admissible against Dorsey. Dorsey's primary contention is that Lang and Redd's jailhouse calls would be inadmissible in a trial without Redd, and that Redd has been joined in this case solely for the purpose of playing these statements to a jury who will decide Dorsey's fate. As the Government tacitly acknowledges, the "backdoor" introduction of statements in this manner may, in some cases, prove prejudicial. *See Cardwell*, 433 F.3d at 388 (quoting *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933 (1993)). Accordingly, the Government has advanced numerous arguments to support the proposition that all of the statements between Lang and Redd would be admissible in a trial against Dorsey alone.

This Court makes three evidentiary rulings in advance of trial to dispel any concerns that joinder is improper based on the alleged "backdoor" introduction of certain hearsay statements. Although controversy has enveloped the admissibility of nearly every relevant word exchanged between Dorsey and Lang, the parties' briefing and arguments during the Motions Hearing reveal that three separate statements drive most of the debate. These statements are addressed in turn.

In the first of these statements, Redd tells Lang that his "little man" (Dorsey) "earned his way today." The Government proposes that this statement would be admissible in a trial without Redd because it is either not hearsay or because it fits within one of the hearsay exceptions: (1) it is not offered for the truth of the matter asserted; (2) it is an adoptive admission; (3) it is the statement of a coconspirator; (4) it is an excited utterance; (5) it reflects Redd's state of mind; and (6) it is admissible under the "residual exception" under the Federal Rules. (Gov. Ex. D at 2, ECF No. 85-3.)

The statement is classic hearsay, as it is an out of court statement offered for the truth of the matter asserted, *i.e.*, that Dorsey shot Benson. *See* Fed. R. Evid. 801(c)(2). It is not an "adoptive admission," *see* Fed. R. Evid. 801(d)(2), because the Government has not offered sufficient evidence to suggest that Dorsey or another codefendant overheard this statement and failed to disavow it. *See United States v. Williams*, 445 F.3d 724, 735 (4th Cir. 2006) (requiring "sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced to the statement" for exception to apply) (citation omitted). Although other voices can be heard in the background of the Redd-Lang phone calls, it is not at all clear that Redd's statement was heard by anyone besides Lang. Nor is this statement

properly considered a "coconspirator statement" under Rule 801(d)(2)(E), because it is not made in furtherance of a conspiracy, but rather only recounts previous events to a third-party. *See* Fed. R. Evid. 801(d)(2)(E) (requiring that the statement be made "during and in furtherance of the conspiracy.")  The statement is not an "excited utterance," either, as Redd made his statement in a calm manner, well after the events in question elapsed, and from a different location. *See United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007) (noting that excited utterances are made under the stress of the exciting event and are spontaneous, rather than the product of reflection).  It certainly does not reflect Redd's "state of mind," as Redd is recalling previous activity and not his present sense impressions. *See* Fed. R. Evid. 803(3) (excluding "a statement of memory or belief to prove the fact remembered or believed").  Finally, this Court will not exercise its discretion to admit the statement under the residual exception, as the statements on the call lack the "guarantees of trustworthiness" necessary for the employment of this rare exception to the Federal Rules of Evidence. *See* Fed. R. Evid. 807(a)(1).  The Government can hardly simultaneously claim that Redd's statements are entitled to heightened trustworthiness and that Redd had perjured himself before the grand jury.

Having concluded that Redd's statement would not be admissible in a trial without him, this Court now considers whether the statement ought to be admissible in the joint trial of Dorsey, Douglas, and Redd.  The Government may introduce Redd's comments against him, and him alone, as the "statements of a party opponent" under Rule 801(d)(2)(A).  Admission of the statement under this rule, however, would be unfairly prejudicial to Dorsey because it directly implicates him in the murder and robbery of Benson.  Under these

circumstances, there is an untenable risk that the jury would improperly consider the statement when resolving Dorsey's guilt. Accordingly, this statement is inadmissible as unduly prejudicial under Fed. Rule Evid. 403. With the offending statement removed from evidence, the parties may safely proceed with a joint trial.[7]

In the second of these statements, Redd recalls that Dorsey told him to "come get me" and that he replied, "I'm on my way." During the Motions Hearing, the Government indicated that this statement was critical to its case against Redd and his codefendants. It seeks to introduce the statement as a "statement against interest" pursuant to Fed. R. Evid. 804(b)(3). The exceptions under Rule 804 apply only to a declarant who is unavailable. A declarant is considered unavailable as a witness if the declarant "is exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies." 804(a)(1). A witness is "unavailable" for purposes of this rule when he invokes his right against self-incrimination. *United States v. MacCloskey*, 682 F.2d 468, 478 (4th Cir. 1982). The Supreme Court has called for a fact-intensive inquiry when analyzing statements against interest, which must be viewed "in context" to determine whether they were truly self-incriminatory. *Williamson v. United States*, 512 U.S. 594, 603-04 (1994). A statement is considered "against interest" if "at the time [it] was made, exposed [the declarant] to criminal liability such that a

---

[7]     Dorsey additionally argues that the introduction of the Redd call implicates the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968), which requires severance when a nontestifying codefendant's confession naming the defendant as a participant in the conspiracy will be admitted at trial. *Bruton*, however, "is simply irrelevant in the context of nontestimonial statements." *United Sates v. Dargan*, 738 F.3d 643, 650-51 (4th Cir. 2013). As Redd's phone calls with an inmate are not testimonial, the Confrontation Clause and *Bruton* are simply not at issue here. *See Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1254 (2004) (explaining that 'testimonial' statements include "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.") (quoting *White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in the judgment)).

reasonable person in [his] shoes would not have made the statements unless believing them to be true." *United States v. Jordan*, 509 F.3d 191, 200-03 (4th Cir. 2009) (holding that district court properly admitted codefendant's statements made to third party under Rule 804(b)(3)). Such statements are admissible against the declarant as well as his codefendants. *See United States v. Holmes*, 30 F. App'x 302, 307-08 (4th Cir. 2002) (finding that codefendant's statements, relayed at trial through the testimony of his cellmate, were admissible against the defendant as statements against interest); *United States v. Hamilton*, 19 F.3d 350, 356-57 (7th Cir. 1994) (holding that statement deemed admissible under Rule 804(b)(3) could properly be admitted against codefendant and no limiting instruction was required).

Redd's statements that Dorsey told him to "come get me" and that he replied with "I'm on my way" are admissible under Rule 804. First, Redd will be "unavailable" at trial should he invoke his right against self-incrimination. Second, Redd's statements are made against his interest as they expose him to liability. Viewed in the fuller context of Redd's other comments to Lang, Redd's recollection that he eagerly responded to his codefendant's request for assistance implicates him as an accessory after the fact. A reasonable person would not have opened themselves to liability by discussing their involvement in a criminal enterprise unless believing the statements to be true. The statements are admissible against both Redd and his codefendants. As Redd's statement would be admissible against Dorsey under this exception to the hearsay rule regardless of Redd's joinder, the admission of this statement does not require severance and the statement may be introduced in a joint trial.

In the last statement, Redd tells Lang that he "just pulled up down outback" with "Ameer and Boosie." This statement would be admissible against Dorsey regardless of Redd's

joiner. Assuming that this statement would be offered for the truth of the matter asserted, it is nevertheless admissible under the "present sense impression" exception to the hearsay rule because Redd is describing what is happening to him (arriving "outback" with Ameer and Boosie) as it happens. *See* Fed. R. Evid. 803(1) (permitting "a statement describing or explaining an event or condition, made while or immediately after the declarant perceived it").

In sum, a joint trial may safely proceed. One portion of the testimony from the Redd call will not be admitted at trial because it is unfairly prejudicial to Dorsey. With this single statement removed from evidence, severance is unnecessary. Many of Redd's other statements, including his statement that he "just pulled up down outback" would be admissible against Dorsey regardless of Redd's presence in the trial. With these evidentiary rulings in place, it becomes clear that Redd's inclusion in this trial in no way prejudices Dorsey or *vice versa*. Accordingly, severance is not required and this case will proceed to a joint trial on Monday, September 9, 2019.

## CONCLUSION

For the reasons stated above, Defendant Dorsey's Motion to Suppress Warrant Evidence (ECF No. 44) is DENIED; Defendant Sim Redd's Motion for Severance (ECF No. 71-1) is DENIED; Defendant Dorsey's Motion to Sever (ECF No. 72-1) is DENIED; and Defendant Dorsey's Motion to Dismiss (ECF No. 73) is DENIED. A joint trial will commence on Monday, September 9, 2019.

A separate order follows.

Dated: August 13, 2019 _____/s/_____
Richard D. Bennett
United States District Judge